**Opinion issued August 29, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00271-CR

## NO. 01-22-00272-CR

———————————

**LEONIDAS CEDILLO JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 20-CR-1407 & 20-CR-1408**

---

## MEMORANDUM OPINION

In these two appeals, appellant Leonidas Cedillo Jr. challenges his convictions

for two sexual offenses against his two daughters: the first-degree felony offense of

continuous sexual abuse of young children against both daughters and the second-

degree felony offense of sexual assault of a child against his oldest daughter.[1] *See*

TEX. PENAL CODE §§ 21.02(b), (h), 22.011(a)(2), (f). Cedillo was sentenced to life

imprisonment for the continuous sexual abuse offense and twenty years'

imprisonment for the sexual assault of a child offense, and the trial court ordered the

sentences to run consecutively. *Id.* §§ 12.32(a), 12.33(a). In two issues on appeal,

Cedillo argues that (1) the trial court erred by refusing to instruct the jury to disregard

the State's questioning of a trial witness about whether Cedillo refused consent to

provide a DNA sample without a warrant; and (2) his convictions and punishments

for the same conduct against the same complainant under two separate penal statutes

violate the Double Jeopardy Clause in the Fifth Amendment of the United States

Constitution. We affirm.

## Background

In 2008, Cedillo divorced his wife and obtained custody of their three

children: five-year-old L.C. ("Lisa"), two-year-old R.C. ("Rose"), and a son.[2] At

trial, Lisa testified that Cedillo forced her to have sexual intercourse with him for

---

[1]    Appellate cause number 01-22-00271-CR corresponds to trial court case number 20-CR-1408, which concerns the conviction for sexual assault of a child. Appellate cause number 01-22-00272-CR corresponds to trial court case number 20-CR-1407, which concerns the conviction for continuous sexual abuse of young children.

[2]    We use pseudonyms to protect the privacy of the minor complainants and their family members.

2

the first time when she was eleven years old.[3] She described the first incident in detail, which occurred in her brother's room while he was asleep. Cedillo subsequently forced Lisa to have sex with him regularly, sometimes as often as every other day, until she was sixteen.

Lisa testified in detail about various acts of sexual abuse, describing rooms in the family's home, specific pieces of furniture used, and times of day when the abuse occurred. She distinguished between sexual abuse that occurred before and after she turned fourteen based on Hurricane Harvey's flooding of the Houston area in August 2017, within a few weeks of her fourteenth birthday, which required "a big renovation on the house" and buying new furniture.[4] This timing was important because the offense of continuous sexual abuse of a young child—one of the offenses of which Cedillo was convicted—requires that the complainant be under fourteen years old. *See* TEX. PENAL CODE § 21.02(b)(2)(A). Lisa testified that Cedillo sexually abused her in rooms and on furniture that existed both before and after the Cedillos remodeled their house following Hurricane Harvey.

---

[3] Lisa also testified that Cedillo had sexually abused her once before in a bathroom of the family home when she was ten years old, but she could not recall the details of this incident.

[4] "Hurricane Harvey moved through the Houston area in late August 2017, bringing record-setting rains and causing widespread flooding." *San Jacinto River Auth. v. Ogletree*, 594 S.W.3d 833, 837 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

Around Christmas 2019, Rose made an outcry to Lisa. As Rose testified at trial, Cedillo forced Rose to have sexual intercourse with him two times in November 2019. She was thirteen at the time, and these were the only two incidents of sexual abuse involving Rose.

After hearing Rose's outcry, Lisa decided to tell her and Rose's mother. Lisa worried, however, that she would not be believed without proof. She knew from prior experience that Cedillo would sometimes ejaculate on her clothing after sexually assaulting her, so she planned to keep a piece of soiled clothing with Cedillo's DNA after the next incident. Shortly thereafter, Lisa arrived home from school one day, and Cedillo "pushed [her] up against the back of the couch" and told her to remove her clothes. She pulled her pants and underwear down "to around mid[-]thigh," not wanting to remove them completely. Cedillo did not use a condom, and he ejaculated on Lisa's underwear. Lisa "knew [she] had to keep the underwear," so after Cedillo left, she immediately removed them and put them in the back of a dresser drawer in her bedroom. Lisa testified that she was "[s]ixteen, almost seventeen," when this final incident occurred.

Lisa made her outcry to her mother in early 2020. Within a few days, Lisa's mother reported the incident to law enforcement, and Lisa was interviewed at the Child Advocacy Center on February 5, 2020. Police obtained a search warrant and recovered the underwear from the dresser at Cedillo's house. Police obtained a

4

second search warrant to collect a sample of Cedillo's saliva to compare his known DNA profile to the DNA found in the semen deposited in Lisa's underwear. The DNA matched.

A Galveston County grand jury indicted Cedillo for two offenses. First, he was charged with the first-degree felony offense of continuous sexual abuse of both Lisa and Rose when they were each under fourteen years old. *See id.* § 21.02(b), (h). The grand jury also indicted Cedillo for the second-degree felony offense of sexual assault of Lisa when she was under seventeen years old based on the sexual assault that occurred after Rose made the outcry around Christmas 2019. *See id.* § 22.011(a)(2)(A), (c)(1), (f). Cedillo pleaded not guilty to the charges.

At trial, the State called as a witness Detective Fidencio Gonzalez, who investigated the offenses. During the State's examination, the State asked Gonzalez several times if Cedillo had been asked to consent to provide a DNA sample without a warrant. Gonzalez testified unequivocally that he did not recall Cedillo having been asked to provide consent. The State attempted to refresh Gonzalez's recollection with a supplemental police report, asking Gonzalez whether the document showed that Cedillo "was asked to provide a DNA sample and refused[.]" Before Gonzalez could answer, the trial court sua sponte interjected and recessed the jury for the day. Outside the presence of the jury, the trial court admonished the State

5

for attempting to elicit inadmissible hearsay and ordered the State "to ask a different question because it looks like you're going down a hearsay route."

Before trial resumed the following morning, Cedillo filed a motion for mistrial. He argued that the State had "introduced evidence to support an implied admission" of the charged offense based on Cedillo's refusal to "consent to a warrantless search and seizure of a sample of his saliva . . . ."

At a hearing on the motion, defense counsel complained about a "reference made to [Cedillo] coming into contact with law enforcement and refusing to consent to search and seizure of his saliva forcing law enforcement to go and get a warrant which is already in evidence for his forceable seizure of saliva[.]" The trial court denied the motion for mistrial. Defense counsel then requested that the trial court instruct the jury to disregard "the testimony regarding [Cedillo's] refusal to consent to a search of his saliva." The court denied the request.

The jury convicted Cedillo of both offenses: continuous sexual abuse of Lisa and Rose when they were each under fourteen years old, and sexual assault of Lisa when she was under seventeen.

During the punishment phase of trial, Cedillo raised a double jeopardy objection. He argued that he could not be found guilty of the offense of sexual assault of Lisa after having been found guilty of the offense of continuous sexual abuse of young children, which involved the same conduct against the same complainant. The

6

trial court overruled the objection as untimely because it was raised during the punishment phase of trial. Cedillo then requested that the court strike the jury charge on the sexual assault offense because it was double jeopardy to find him guilty of that offense and the offense of continuous sexual abuse of young children. The trial court again overruled the objection as untimely.

The jury sentenced Cedillo to life imprisonment for the offense of continuous sexual abuse of young children, and it sentenced him to twenty years' imprisonment for the offense of sexual assault of a child. *See id.* §§ 12.32(a), 12.33(a). The trial court signed judgments of conviction ordering that the sentences shall run consecutively. This appeal followed.

### Instruction to Disregard Evidence

In his first issue, Cedillo contends that the trial court erred by refusing to instruct the jury to disregard the State's questions to Detective Gonzalez about whether Cedillo had refused to provide a warrantless DNA sample. Cedillo argues that the questions improperly attempted to establish guilt by commenting on his Fifth Amendment right to remain silent. Although Cedillo concedes that Gonzalez "did not affirmatively testify that Cedillo had refused" consent, Cedillo argues that "the State's persistent questioning, and the fact that a warrant was obtained, made it obvious to the jury that he had" refused consent.

We first address the State's argument that Cedillo did not preserve error on this issue because his appellate challenge to the State's questioning differs from his trial objection to the witness's testimony. To preserve a complaint for appellate review, the record must show that a party made a timely objection stating with sufficient specificity the grounds for the ruling that the party sought unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1). An issue presented on appeal must correspond with the objection made at trial. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Lyssy v. State*, 429 S.W.3d 37, 40 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "An objection stating one legal theory may not be used to support a different legal theory on appeal," even if the alleged error implicates constitutional guarantees. *Lyssy*, 429 S.W.3d at 40 (quoting *Broxton*, 909 S.W.2d at 918).

"The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Id.* (quoting *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009)). In deciding whether a general complaint suffices to preserve error, we consider the context of the complaint. *Resendez*, 306 S.W.3d at 313; *Lyssy*, 429 S.W.3d at 41. "[W]hen the context shows that a party failed to effectively communicate his argument, then the error will be deemed forfeited on appeal."

*Lyssy*, 429 S.W.3d at 41 (quoting *Resendez*, 306 S.W.3d at 313). But "[w]hen the correct ground for exclusion was obvious to the judge and opposing counsel, no forfeiture results from a general or imprecise objection." *Lyssy*, 429 S.W.3d at 41 (quoting *Resendez*, 306 S.W.3d at 313).

At trial, Detective Gonzalez testified about his investigation of the offenses, including that he obtained two search warrants. The second warrant was to collect a sample of Cedillo's saliva to compare his DNA to the DNA found in Lisa's underwear. The State asked Gonzalez whether Cedillo had refused consent to provide a DNA sample without a warrant in the following exchange:

Q.    In your prior conversations with the defendant both on the phone and during the execution of the first search warrant, did you ever talk to him about needing a buccal swab from him?

A.    I don't recall if I did.

Q.    Did you remember ever asking him to give consent for you to collect his DNA?

A.    I don't recall.

Q.    Would reviewing your report refresh your recollection as to whether or not you asked for his DNA?

A.    Yes.

* * * *

Defense:    While he's looking I'll stand up and make an objection as to say what this relevance is.

Court:    Response.

State:    Judge, the defendant's frame of mind when he's asked for a sample of his own biological DNA for comparison, I

9

think that that goes to his culpability if he were to have conversations about whether he would give consent or not give consent to provide his DNA. And anything that he said in that regard is not subject to hearsay.

Defense: We think that's an unfair inference to his pre-arrest silence in this case.

Court: Objection is overruled.

Witness: I don't believe that I asked that prior to the search warrant being issued.

Q. (By State) And in your role as the detective on the case do you review the work or reports of the other officers that would be involved?

A. Yes.

Q. To your knowledge did anyone ask that of the defendant to provide a sample of his DNA?

Defense: Object to speculation, Judge.

Court: Answer it only if he knows.

Defense: Judge, may I take the witness on a voir dire?

Court: You may.

## VOIR DIRE EXAMINATION

By Defense:

Q. Do you remember asking him for his DNA swab?

A. I don't. I don't recall.

Q. Do you remember anybody asking him? I've read that report. I don't remember it. Do you remember it?

A. I don't recall.

Q. Thank you.

Defense: Renew my objection that this is not within his personal knowledge, Judge.

| | |
|---|---|
| Court: | Overruled. I'm going to let him check his report to see if he can refresh his memory. And if he can't refresh his memory then let[']s move along. |

DIRECT EXAMINATION (cont'd)

By State:

Q. Are there supplements from other officer[s]?

A. Yes.

Q. Is there a supplement from Officer Oliver that you told us about earlier?

A. Yes, there is.

Q. As part of your investigation, would you take into account the information in his supplement in your investigation?

A. Yes.

Q. Is his supplement included in the documents that you have?

A. I would have to check. I'm not entirely sure if it is or not.

Defense: I guess as trial counsel I should object to the witness [refreshing] his recollection from a hearsay report that is not his.

Court: Overruled.

Witness: Yes, I do have a copy of that report, that supplement.

Q. (By State) And in that supplement is it documented that the defendant was asked to provide a DNA sample and refused?

Court: Let's take a break for the day. . . .

After the trial court sua sponte stopped the trial proceedings and dismissed the jury

for the day, the court admonished the State for attempting to elicit inadmissible

hearsay. The court ordered the State "to ask a different question because it looks like you're going down a hearsay route."

Cedillo filed a motion for mistrial arguing that the State had "introduced evidence to support an implied admission" of the charged offenses because the evidence showed that Cedillo "refused consent to a warrantless search and seizure of a sample of his saliva . . . ." Cedillo argued that the error could not be cured by an instruction to disregard the evidence.

Before trial resumed, the trial court held a hearing on the motion for mistrial. Defense counsel objected to the "reference made to [Cedillo] coming into contact with law enforcement and refusing to consent to search and seizure of his saliva forcing law enforcement to go and get a warrant which is already in evidence for his forceable seizure of saliva[.]" The State responded that it asked the witness, "Did you ask for consent before getting a warrant," and the witness did not answer "one way or the other[.]" The court denied the motion for mistrial.

Defense counsel then requested that the trial court instruct the jury to disregard "the testimony regarding [Cedillo's] refusal to consent to a search of his saliva." The court denied the request.

We disagree with the State that Cedillo waived error on his first issue. On appeal, Cedillo challenges the State's questioning of Gonzalez about Cedillo's purported refusal to consent to provide a DNA sample without a warrant. As the

12

State correctly notes, after the trial court denied Cedillo's motion for mistrial, Cedillo requested that the court instruct the jury to disregard *testimony*, not the State's questions. It is this request for a curative instruction that the State argues did not preserve error.

The State's narrow argument, however, omits important context that we must consider in determining whether Cedillo's trial complaint preserved error for the issue he raises on appeal. *See Resendez*, 306 S.W.3d at 313; *Lyssy*, 429 S.W.3d at 41. When the State began its line of questioning, defense counsel objected on relevancy grounds. At that point, Gonzalez had only testified that he did not recall whether Cedillo was asked to provide a DNA sample without a warrant. When the State replied that the testimony was relevant to Cedillo's state of mind and "goes to his culpability," defense counsel argued that attempting to elicit the testimony constituted "an unfair inference to his [Cedillo's] pre-arrest silence in this case." Defense counsel repeatedly objected to the State's questioning until the trial court stopped the proceedings and recessed for the day.

Cedillo continued his objections in the motion for mistrial, specifically challenging the State's attempt to elicit testimony "to support an implied admission" of guilt from Cedillo's refusal to consent to a warrantless seizure of his DNA. At the hearing on the motion, defense counsel expressly objected to a "reference made to" Cedillo's refusal to consent to provide a warrantless sample of his DNA.

13

Considered in its proper context, the trial record reveals that Cedillo's objections were directed at the State's questions. The State made the only reference to such a refusal when it asked Gonzalez whether Cedillo "was asked to provide a DNA sample and refused[.]" Gonzalez testified only that he did not recall whether Cedillo was asked to provide a DNA sample without a warrant. The record therefore indicates that "the correct ground for exclusion was obvious to the judge and opposing counsel," and therefore "no forfeiture results from a general or imprecise objection." *See Lyssy*, 429 S.W.3d at 41 (quoting *Resendez*, 306 S.W.3d at 313). We conclude that Cedillo preserved error on his first appellate issue.

Nevertheless, we also conclude that the trial court did not err by refusing to give the jury a curative instruction. The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Among other protections, this right prohibits the State from commenting on a defendant's refusal to testify at trial. *Salinas v. State*, 369 S.W.3d 176, 178 (Tex. Crim. App. 2012), *aff'd*, 570 U.S. 178 (2013). A defendant's *pretrial* silence, however, is "considerably less protected from being commented upon at trial." *Id.*

Whether the Fifth Amendment protects pretrial silence depends on several factors, including whether the defendant was in police custody, whether he was informed of his *Miranda* rights, and whether evidence of pretrial silence was offered

as substantive evidence of guilt or elicited from a testifying defendant. *Id.* The Court of Criminal Appeals has held that "pre-arrest, pre-*Miranda* silence is not protected by the Fifth Amendment right against compelled self-incrimination, and that prosecutors may comment on such silence regardless of whether a defendant testifies. The trial court [does] not err in allowing the State to do just that." *Id.* at 179.

Here, Cedillo does not argue—and the record does not indicate—that he was under arrest or in custody or that police had read him *Miranda* warnings prior to the time he would have had an opportunity to consent to a warrantless collection of his saliva. *See id.* at 178. Indeed, at the hearing on the motion for mistrial, defense counsel conceded that the challenged question implicated Cedillo's "*pre-arrest* silence.*" (Emphasis added.) At trial, Gonzalez testified that when officers served the warrant for Cedillo's saliva sample, Cedillo answered the door of his house and complied with the warrant, indicating that he was not under arrest or in custody when he would have been asked to provide a saliva sample without a warrant. *See id.* Because Cedillo challenges a reference to his pre-arrest, pre-custodial, pre-*Miranda* silence, we hold that the trial court did not err by denying his request for a curative instruction. *See id.* at 179. We overrule Cedillo's first issue.

## Double Jeopardy

In his second issue, Cedillo argues that he was convicted and punished for the same sexually assaultive conduct against Lisa under two separate penal statutes: once for the offense of continuous sexual abuse of young children and again for the offense of sexual assault of a child. Cedillo contends that being convicted and punished under these separate statutes for the same conduct violates the Double Jeopardy Clause in the Fifth Amendment of the United States Constitution.

We first address the State's argument that Cedillo waived error by failing to timely object on double jeopardy grounds. To preserve error, a defendant must raise a double jeopardy objection no later than when the guilt-innocence charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000); *Porras v. State*, No. 08-13-00149-CR, 2015 WL 5158375, at *2 (Tex. App.—El Paso Sept. 2, 2015, no pet.) (mem. op., not designated for publication). When error is not preserved, however, the defendant may still raise a double jeopardy issue for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Gonzalez*, 8 S.W.3d at 643.

Cedillo raised the double jeopardy objection during the punishment phase of trial after the jury had already returned a guilty verdict on both counts. When asked

16

whether he objected to the punishment charge, Cedillo argued that the jury "could technically find" him guilty and punish him for both offenses based on the same conduct against Lisa. Cedillo's objection on double jeopardy grounds during the punishment phase of trial was untimely. To preserve error, Cedillo was required to raise this objection when or before the guilt-innocence charge was submitted to the jury. *See id.* at 642; *Porras*, 2015 WL 5158375, at \*2 (holding that double jeopardy objection was untimely because defendant raised it after guilt-innocence charge was submitted to jury and after jury returned guilty verdict on all counts). We therefore conclude that Cedillo did not preserve error on the double jeopardy issue.

Nevertheless, as stated above, Cedillo may still raise a double jeopardy issue on appeal if "the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *See Gonzalez*, 8 S.W.3d at 643. Cedillo does not expressly make either argument on appeal. To the extent we can construe Cedillo's arguments to raise an unpreserved double jeopardy issue, however, we will consider them. *See id.*

The Double Jeopardy Clause in the Fifth Amendment of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V; *see also* TEX. CONST. art. I, § 14 ("No person, for the same offence, shall be twice put in jeopardy of life

17

or liberty[.]"); TEX. CODE CRIM. PROC. art. 1.10 (same); *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (holding that Fifth Amendment Double Jeopardy Clause applies to states through Fourteenth Amendment Due Process Clause). There are three types of double jeopardy: (1) a second prosecution for the same offense following acquittal; (2) a second prosecution for the same offense following conviction; and (3) multiple punishments for the same offense. *Ex parte Milner*, 394 S.W.3d 502, 506 (Tex. Crim. App. 2013) (citing *Brown v. Ohio*, 432 U.S. 161, 164–65 (1977)). The third type—multiple punishments for the same offense—can be further divided into two categories: (a) the inclusion of a lesser-included offense or (b) punishment of the same criminal conduct under two distinct statutes when the legislature intended only a single punishment for the conduct. *Langs v. State*, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006). Here, Cedillo argues that he was subject to multiple punishments for the same offense under two distinct penal statutes.

In resolving a multiple-punishment double jeopardy claim, such as the one presented here, legislative intent is our primary consideration. *Garfias v. State*, 424 S.W.3d 54, 64 (Tex. Crim. App. 2014). Thus, when

> a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger* [*v. United States*, 284 U.S. 299 (1932)], a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Langs*, 183 S.W.3d at 685 n.15 (quoting *Missouri v. Hunter*, 459 U.S. 359, 368–69 (1983)). To determine whether a defendant has been subjected to multiple punishments for the same offense in violation of the Double Jeopardy Clause, we determine whether the defendant was "convicted of more offenses than the legislature intended." *Ex parte Milner*, 394 S.W.3d at 507 (quoting *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999)).

Here, Cedillo was convicted of two offenses under two separate penal statutes. The first offense—continuous sexual abuse of young children—is defined as follows: during a period of thirty or more days, a person commits "two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims," and the victims were younger than 14 years old "at the time of the commission of each of the acts of sexual abuse[.]" TEX. PENAL CODE § 21.02(b). An "act of sexual abuse" is defined as the violation of several enumerated penal laws, including sexual assault under section 22.011, which is the second offense for which Cedillo was convicted. *See id.* § 21.02(c)(3); *see also id.* § 22.011(a).

Importantly, section 21.02(e) generally prohibits convicting a defendant in the same criminal action of both the offense of continuous sexual abuse of young children and an enumerated act of sexual abuse, such as sexual assault of a child, when both offenses involve the same victim. *Id.* § 21.02(e). However, such

19

convictions are not prohibited when the act of sexual abuse "occurred outside the period" in which the continuous sexual abuse offense was committed. *Id.* § 21.02(e)(2). The Court of Criminal Appeals has held that in determining whether a defendant may be convicted for a continuous sexual abuse offense and a predicate offense against the same victim in the same criminal action, "the proper consideration is whether the evidence shows that the [predicate] offense occurred outside of the period that the continuous abuse offense was committed." *Allen v. State*, 620 S.W.3d 915, 921 (Tex. Crim. App. 2021).

It is undisputed that sexual assault is a predicate act of continuous sexual abuse of young children. *See* TEX. PENAL CODE § 21.02(c)(3). Moreover, Cedillo was convicted in the same criminal action of both offenses, and both offenses involved the same victim, Lisa. *See id.* § 21.02(e). We therefore must determine whether the sexual assault offense occurred outside the period of continuous sexual abuse. *See id.* § 21.02(e)(2).

To determine the period of continuous sexual abuse, we initially note that the indictment for this offense includes acts against both Lisa and Rose. *See id.* § 21.02(b)(1) (providing that continuous sexual abuse offense can be against "one or more victims"). The offense of continuous sexual abuse of young children requires that the victims were younger than fourteen "at the time of the commission of each of the acts of sexual abuse[.]" *Id.* § 21.02(b)(2)(A).

Lisa testified at trial that Cedillo first had sexual intercourse with her in her brother's bedroom when she was eleven years old. *See id.* This act constitutes a sexual assault, and therefore is a predicate act of continuous sexual abuse of young children. *See id.* §§ 21.02(c)(3), 22.011(a)(2)(A). Lisa also testified that she was born in the fall of 2003. Therefore, the trial evidence established that the period of continuous sexual abuse began sometime between the fall of 2014 and the fall of 2015 when Lisa was eleven years old.

Lisa turned fourteen in the fall of 2017. Because the offense of continuous sexual abuse of young children can only occur against victims who are under fourteen, any sexual abuse against Lisa after the fall of 2017 is not considered a predicate act of that offense. *See id.* § 21.02(b)(2)(A) (stating that person commits offense of continuous sexual abuse of young children if, "at the time of the commission of *each* of the acts of sexual abuse," victim is "a child younger than 14 years of age") (emphasis added). However, Cedillo was also charged with sexually assaulting Rose as a predicate act of continuous sexual abuse. Rose testified that Cedillo sexually assaulted her two times in November 2019 when she was thirteen years old, and these were the only two incidents of sexual assault against Rose. Thus, the period of continuous sexual abuse extended to November 2019 when Rose, who was then under fourteen, was sexually assaulted by Cedillo. *See id.* § 21.02(b)(1) (providing that offense can be against "one or more victims").

21

On appeal, Cedillo concedes that "the longest span of continuous abuse supported by the record . . . ends in November of 2019, when [Rose] was abused." He argues, however, that Lisa testified about numerous sexual assaults and the jury charge did not limit the time frame of the sexual assault offense, and therefore the jury could have convicted him of the offense of sexual assault based on one of the assaults that occurred during the period of continuous sexual abuse.

First, most of Cedillo's appellate arguments rely on disputed facts that are not apparent on the face of the record. For example, no part of the record supports Cedillo's argument that the jury convicted him of a sexual assault that occurred during the period of continuous sexual abuse. Because Cedillo did not timely object on double jeopardy grounds, we may not consider his appellate arguments that are based on disputed facts which are not clearly apparent on the face of the record. *See Gonzalez*, 8 S.W.3d at 643.

Second, as Cedillo acknowledges on appeal, Lisa testified about only one instance of sexual assault against her that occurred after Rose made the outcry around Christmas 2019. *See* TEX. PENAL CODE § 21.02(e)(2); *Allen*, 620 S.W.3d at 921 (holding that proper consideration under section 21.02(e)(2) is "whether the evidence shows that the [predicate] offense occurred outside of the period that the continuous abuse offense was committed"). Although the trial record does not specify a precise date of this incident, the record indicates that it occurred after the

sexual assault of Rose in November 2019 and after Rose's outcry around Christmas 2019.

Lisa testified that after Rose made the outcry, Lisa decided to tell the girls' mother. Lisa was concerned that she would not be believed, so she decided to obtain proof. She knew that Cedillo would sometimes ejaculate on her clothing after sexually assaulting her, so she planned to keep a piece of clothing with Cedillo's DNA if she was sexually assaulted again. Sometime later, Cedillo forced Lisa to have sexual intercourse with him, he did not use a condom, and he ejaculated on her underwear. Afterwards, Lisa went to her room and "knew [she] had to keep the underwear," so she put them in the back of her dresser. Lisa told her mother about Cedillo's actions in early 2020, Lisa's mother reported Cedillo to law enforcement, and Lisa was interviewed by a forensic interviewer at the Child Advocacy Center on February 5, 2020. Lisa testified that she was "[s]ixteen, almost seventeen," when this final sexual assault occurred.

This evidence establishes that the final sexual assault of Lisa occurred sometime between Rose's outcry in December 2019 and the outcry to the girls' mother in early 2020. Because Lisa was over fourteen years of age, this incident could not have been included in the period of continuous sexual abuse of young children. *See* TEX. PENAL CODE § 21.02(b)(2)(A). Furthermore, no additional predicate acts occurred against Rose after this incident, and therefore the period of

continuous sexual abuse concluded with the last sexual assault of Rose in November 2019.[5] The evidence therefore establishes that the final sexual assault of Lisa occurred after the period of continuous sexual abuse ended. *See id.* § 21.02(e)(2).

Cedillo relies on *Allen v. State*, in which the defendant was convicted of several sexual offenses, including continuous sexual abuse of a young child and one of the predicate offenses, indecency with a child by contact. *See* 620 S.W.3d at 916. Allen argued that his conviction for both offenses violated section 21.02(e) and the Double Jeopardy Clause because the evidence showed that the indecency offense occurred within the continuous sexual abuse period. *Id.* at 918. The *Allen* court first determined that the evidence established that the period of continuous sexual abuse occurred "from the middle of the 2008–2009 school year through December 2011." *Id.* at 922. The court then determined that the predicate indecency offense occurred in December 2011, and thus was "part of the same, long continuous offense." *Id.* at

---

5    The indictment for this offense alleges that the period of continuous sexual abuse occurred from September 14, 2012, through February 4, 2020. Cedillo does not argue that these dates control our analysis. Indeed, "the particular date alleged in the indictment is not binding on the prosecution, and a conviction may be had based on evidence showing a completely different date than that alleged in the indictment." *Allen v. State*, 620 S.W.3d 915, 920 (Tex. Crim. App. 2021). In determining whether a defendant may be convicted in the same criminal action for a continuous sexual abuse offense and a predicate offense involving the same victim, "the proper consideration is whether *the evidence* shows that the [predicate] offense occurred outside of the period that the continuous abuse offense was committed. The determination does not consider whether the [predicate] offense occurred outside the time period *alleged in the indictment* for the continuous abuse offense." *Id.* at 921 (emphasis added).

921–22. Because the predicate offense occurred against the same victim and within the period of continuous sexual abuse, the defendant's conviction for both offenses violated section 21.02(e)(2). *Id.* at 922. Because the court reversed on statutory grounds, it did not reach the alternate double jeopardy issue. *Id.*

Unlike in *Allen*, the last sexual assault of Lisa could not have been included in the period of continuous sexual abuse because Lisa had already turned fourteen years old and there was no subsequent predicate offense committed against Rose. *See* TEX. PENAL CODE § 21.02(b)(2)(A). This case is therefore factually distinguishable from *Allen*.

We hold that Cedillo has not established a violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution based on undisputed facts that are clearly apparent on the face of the record. *See Gonzalez*, 8 S.W.3d at 643. We therefore need not analyze the second prong of the test. TEX. R. APP. P. 47.1; *see Langs*, 183 S.W.3d at 680 (affirming after determining that defendant "failed to satisfy the first prong of *Gonzalez*"); *Porras*, 2015 WL 5158375, at *3. We overrule Cedillo's second issue.

## Conclusion

We affirm the judgments of conviction in these two appeals.

April L. Farris
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).